In The United States District Court

For The Western District of Wisconsin

FILED/REC'D

2024 SEP 18  A 10: 44

CLERK OF COURT
U.S. DISTRICT COURT
WD OF WI

MICHAEL YATES,

          Plaintiff,

v.

                                       Case No.: 22-cv-472-wmc

KARL HOFFMAN, et al.,

          Defendant,

---

## MOTION IN RESPONSE TO SUMMARY JUDGEMENT

---

Plaintiff Michael Yates, pro se, hereby responded to the Defendant's summary judgement motion (Dkt. 61) pursuant to Fed.R.Civ.Proc 56, and asks the Court to deny the Defendant's motion and allow his claims to proceed to trial.

The grounds for this motion are contained within the Plaintiff's Brief in Opposition to Summary Judgement, Plaintiff's Proposed Findings of Fact, Plaintiff's Declarations, Exhibits and all pleadings of record.

The defendants are notified that all documents submitted with this motion are incorporated by reference herein.

Respectfully submitted September 16th, 2024.

                         _Michael Yates_
                         Michael Yates

                         WI DOC #349130
                         Jackson Correctional Institution
                         P.O. Box 233
                         Black River Falls, WI 54615

In The United States District Court

For The Western District of Wisconsin

MICHAEL YATES,

        Plaintiff,

    v.                                                     Case No.: 22-cv-472-wmc

KARL HOFFMAN, et al.,

        Defendant,

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

### STATEMENT OF THE CASE

This is a § 1983 action filed by Plaintiff Michael Yates, pro se, seeking damages, declaratory judgement and injunctive relief based upon Eighth Amendment claims of deliberate indifference by Defendants Karl Hoffman, MD, Roslyn Huneke, RN, HSM, and Daniel Lavoie, MD, WI DOC Medical Director, while Plaintiff was incarcerated at New Lisbon Correctional Institution. In short, Defendants failed to provide adequate medical treatment and care for Plaintiff's serious medical condition and prolonged his pain and suffering for no penological reason.

### INTRODUCTION

The Defendant's claim that Yates was provided constitutionally adequate medical care because he ultimately received a treatment that relieved his back pain. They portray Yates as an impatient, demanding inmate that was insisting upon his desired form of treatment despite admitting that he never specified what this desired treatment was. And that Yates was nothing more than a malingering, drug seeking inmate despite Yates having no history or record of drugs abuse and having sworn off recreational drug use as a teenager after a friend died of a drug overdose.

However, this suit is not about Yates' arriving at his ultimate destination of pain relief. It is about Yates' 10 month odyssey of constant pain, increasing symptoms of nerve damage, unaddressed

pleas for help, ineffective pain medications, and the Defendant's obdurate refusal to adequately treat his serious medical condition and timely order and schedule his appointments.

The Defendant's summary judgement motion cannot stand. The record is replete with evidence of responses without assistance, false statements, failures to follow established protocols, failures to use medical judgement, persisting with ineffective treatments, unnecessary delays in scheduling, blind adherence to protocol while ignoring constitutional safeguards, and deliberate indifference to Yates' pain and suffering. Because the Defendants cannot refute their own record and sworn testimony, the Court should deny the Defendant's motion and permit Yates to proceed to trial with his claims.

## STATEMENT OF CASE

For a full presentation of facts relevant to this lawsuit, the Plaintiff directs the Court to the Plaintiff's Proposed Finding of Fact (YPFOF) filed in support of his Motion in Opposition to Summary Judgement.

Yates was incarcerated at New Lisbon Correctional Institution (NLCI) during the Relevant Time Period (RTP) between April 2, 2019 and February 28, 2020. He was being treated for chronic back pain by Hoffman before Yates started having new and different pain in his back and hip. (YPFOF ¶ 59.) On April 2nd, Yates told Hoffman about this and was ordered physical therapy. (Id. ¶ 67.) Therapy ended on June 25th without improvement but with an assessment of L4/5 herniation. (Id. ¶ 72.) Over the next two months, Yates wrote Hoffman several times complaining of constant pain and worsening symptoms. (Id. ¶ 73, 75, 77-78, 87.) He was seen by nursing staff twice, the first time resulted in Hoffman ordering an MRI, (Id. ¶ 85), the second resulted in a light duty work restriction. (Id. ¶ 92.) Otherwise, Yates was left with nothing but ineffective medications, ibuprofen and acetaminophen, and consistently told he was scheduled to be seen. Hoffman admits he did not consider Yates' complaints to be serious enough to be seen earlier. (Id. ¶ 97.)

During Yates' August 26th appointment, Hoffman did only one physical test for sciatica, despite being aware of multiple potential causes, and determined that Yates' complaints were not caused by a nerve issue. (Id. ¶ 98a-100b.) He also determined that Yates had an adequate trial of ibuprofen and acetaminophen and ordered duloxetine, an antidepressant, in tandem with them, to address Yates' complaints of pain. (Id. ¶ 104.) But he did not ask Yates if he had ever taken antidepressant drugs before. (Id. ¶ 113.)

Initially, duloxetine lowered Yates' pain from 7-8/10 to 5/10 and it made it clear that standing and walking were aggravating his pain. (Id. ¶ 119.) When Hoffman refused to issue a work

restriction, Yates resigned from his mail runner job to protect his own health. (Id. ¶ 123-24.) Shortly thereafter, Yates started experiencing side effects from duloxetine, that made him irritated and aggressive. (Id. ¶ 128,[f]    .) Hoffman stopped the duloxetine without seeing Yates and without ordering a replacement for it, which left Yates with only ibuprofen and acetaminophen, which Hoffman determined was ineffective 3 weeks earlier. (Id. ¶ 134, 136, 138.)

Hoffman eventually ordered amitriptyline, a different antidepressant, as a replacement. (Id. ¶ 146.)  Yates took it for 4 days and asked to have it stopped because of the mental effects it was causing. (Id. ¶ 162.)  Hoffman stopped it without seeing Yates and without replacing it. He said he had other anti-inflammatory medications but he did not order any at that time. (Id. ¶ 171, 173.)

While dealing with the side effects from duloxetine and amitriptyline, Yates inadvertently took more ibuprofen than prescribed and ended up running out of it early. (Id. ¶ 186.) He wrote to Huneke about this and asked if she could let the prescription be refilled early. Despite being in her office she did not respond until October 7th, the day Yates' refill was refilled. She wrote noting more concern over ibuprofen's potential for causing stomach problems that Yates' existing pain. She also held him accountable for taking more ibuprofen than prescribed while acknowledging it was caused by the side effects from medications they had given him. (Id. ¶ 192-192b.)

Yates' MRI was done on October 1st. It objectively showed significant problems with his back, including nerves being compressed and directly contacted by bone spurs (osteophyte). (Id. ¶ 54, 182.) After reviewing the results, Hoffman ordered a neurosurgery consult the same day (Id. ¶ 190) but waited another week to see Yates and change his medications. (Id. ¶ 197, 206.) During Yates'October 10th appointment, Hoffman did no physical testing but documented an observation of events that did not take place and determined that Yates' complaints of pain were out of proportion to findings. (Id. ¶ 201.)  He replaced Yates' ibuprofen with naproxen, an NSAID that is not indicated for nerve pain caused by compression or contact with nerves. (Id. ¶ 206a.)

On October 16th, Hoffman reviewed the neurosurgeon's recommendation to exhaust all conservative care options, including steroid injections,and submitted a Prior Authorization for a Pain Clinic Referral.  Defendant LaVoie received and approved the Prior Authorization the same day. (Id. ¶ 217, 222, 227.) Hoffman did not notify Yates that it had been approved.  (Id. ¶ 229.)

Yates wrote complaining of constant pain and worsening symptoms on October 28th. He was told that Hoffman was going to order an injection, which he did on October 29th, 13 days after

LaVoie approved it. (Id. ¶ 230-31.)  MPAA Hams, printed the order on October 31st. (Id. ¶ 239.) Yates wrote asking if the injection had been scheduled. He was told it was ordered and they were working on getting it scheduled. (Id. ¶ 240.) Hams faxed the order to Gundersen on November 12th. (Id. ¶ 241.) Yates wrote to Huneke on the 13th asking about the scheduling delays and was told that specialty appointments were usually "booked out a ways." (Id. ¶ 245.)  Yates wrote to her again on November 25th, asking if the injection was scheduled and was told that the Prior Authorization was still on LaVoie's desk awaiting review. (Id. ¶ 250.)  Two days later, on November 27th, Hams called Gundersen and had to refax the order. (Id. ¶ 256.)

On December 27th, Yates went to Gundersen having been told he was going to get an injection. (Id. ¶ 276.) Instead, he had a consultation with Natalie Pomranke who did a comprehensive physical examination and determined Yates had significant pain. She recommended a Lumbar Epidural Steroid Injection (LESI) and a trial of neuropathic pain medication such as gabapentin, and a follow up 2-3 weeks after the injection. (Id. ¶ 277-79.) Hoffman ordered the injection but not make any changes to Yates' medications because he did not believe it was medically necessary. (Id. ¶ 290, 295.)

After Yates received a copy of Pomranke's recommendation, he wrote Hoffman asking he intended to leave him in pain when reasonable options existed. Hoffman replied that his previous trials of "amitriptyline and duloxetine were jokes. I am not amused." And, for the first time, indicated that DOC protocol required a "real test" of these medications.  (Id. ¶ 294.) Yates responded by sending Hoffman copies of his journal documenting his experiences while taking these medications and assuring him that they were no joke, and asking questions about policy requirements. (Id. ¶ 307.)

Hoffman then contacted Gary Kessel claiming that Yates had been persistently insisting on getting gabapentin for his pain, and that it was his belief that Yates was playing him. He asked Kessel how rigid the requirements were for a "decent trial" of duloxetine and amitriptyline, and stated he hoped they were "very rigid" because "I have more than one who will be or are agitating for the gabapentinoids." Kessel responded back stating that gabapentin was now non-formulary and had to have a specific gabapentinoid form submitted, which made approving it more difficult, thus it was more rigid. (Id. ¶ 309-310.) Hoffman then responded back to Yates saying gabapentin was non-formulary, the requirements were rigid and it was DOC's intent not to have it prescribed. (Id. ¶ 311.)

On February 3rd, Yates finally received a LESI. (Id. ¶ 315.) The relief, while not complete, was immediate. And once he was out of severe pain, he did not continue complaining about pain.

*Summary*

After Yates' physical therapy ended without improvement, he was forced to wait two months to be seen despite multiple notices of constant pain and increasing symptoms of sciatica. And when he was seen, Hoffman determined, based on only one test for sciatica, that Yates' pain was not from a nerve issue. He did, however determine ibuprofen and acetaminophen were ineffective when he ordered antidepressant drugs in tandem with them.  But both times the antidepressants caused side effects, Hoffman stopped them without ordering a replacement, leaving Yates with a pain treatment he had determined to be ineffective.

And after Hoffman reviewed the objective MRI findings, he minimized them and determined Yates' complaints of pain were out of proportion to findings because he deemed Yates' functionality to be good. He then prescribed Yates NSAIDs, which are not indicated for the type of nerve pain caused by nerves being compressed and contacted by bone spurs. Despite ongoing complaints of pain and worsening symptoms, Hoffman persisted with these ineffective medications even after receiving a specialist's recommendation for stronger ones. In total Yates was kept in constant pain for ten months despite Hoffman having other untried medications available.

## LEGAL STANDARDS
*Summary Judgement*

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), holding that material facts are those under the applicable substantive law that might affect the outcome of the suit. A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248.

*Deliberate Indifference*

The Eighth Amendment protects inmates from the denial of medical care that results in pain and suffering which no one suggests would serve a penological purpose. *Estelle v. Gamble*, 492 US 97, 102-04; 97 S.Ct. 285 (1976).  Deliberate Indifference claims alleging the denial of medical care have two components, an objective test evaluating whether the plaintiff suffered from a

serious medical need, and a subjective test that asks whether the defendant was deliberately indifferent to that need. Pettis v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016)(en banc).

A defendant can be held liable for unnecessarily prolonging pain, not just making it worse. LaBrec v. Lyon, 2023 WL 6976738 at *4; See Perez v. Fenoglio, 792 F.3d 768, 777–78 (7th Cir. 2015). It is well established that a physician can violate the Eighth Amendment if he persists with treatment that he knows to be ineffective. Id. Regardless of its cause, pain can qualify as a serious medical need. Id.; citing Gonzalez v. Feinerman, 663 F.3d 311, 314 (7th Cir. 2011). Accordingly, a physician that fails to adequately treat an inmate's significant pain can be held liable for an Eighth Amendment violation.

A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted); it "significantly affects a prisoner's daily activities," *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); or it causes significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996). But, it does not have to be life threatening. *Johnson* at 584-85. Prolonged severe pain itself is a serious medical need. *Northern v. Hentz*, 2022 WL 901055 (W.D. WI 2022), citing *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012)

Regarding the subjective test, deliberate indifference requires "more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2009). An inmate must present evidence from which a jury could reasonably infer that "the prison official acted with a sufficiently culpable state of mind," meaning the official knew or was aware of - but then disregarded - a substantial risk of harm to an inmate's health. (Id. at 1030-31). The Court is to look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to a serious medical need. Pettis at 729. The fact that the plaintiff received some medical care is not dispositive if a fact finder could infer that the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the medical condition. As plaintiffs generally lack direct evidence of actual knowledge this is usually shown by circumstantial evidence. Pettis at 728.

## ARGUMENTS

### 1. Defendants Hoffman and Huneke were Deliberately Indifferent to Yates' Serious Medical Condition.

#### Claim A:  Yates had a serious medical need.

A medical need is objectively serious if a physician has diagnosed it as needing treatment. *Donald* at 458, or significantly affects a prisoner's daily activities. *Gutierrez* at 1373.

Hoffman ordered an MRI of Yates' lumbar back and after he reviewed the results he diagnosed Yates with chronic low back pain with L5 radiculopathy. (YPFOF ¶ 85, 223.) And after Natalie Pomranke, Gundersen, recommended a lumbar epidural steroid injection (LESI), (Id. ¶ 279), Hoffman scheduled the injection (Id. ¶ 290) and Dr. Binnegar performed the injection on February 3rd. (Id. ¶ 316.)

Accordingly, Hoffman diagnosed Yates' condition as needing treatment and he ordered that treatment. Therefore, Yates had a serious medical need. *Donald*. The defendants do not dispute this,

### Claim B:  Hoffman refused to see Yates for two months while knowing his pain medications were ineffective.

A defendant can be held liable for unnecessarily prolonging pain. *LeBrec at* \*4. Refusing to do a simple exam or even lay eyes on plaintiff allows a reasonable jury to conclude that the doctor did not exercise the minimal standard of care necessary when deciding not to examine plaintiff. *Leiser* at 19-20. A prison doctor may exhibit deliberate indifference to a known condition through inaction. *Gaston v. Ghosh,* 498 Fed. Appx. 629, 631-32 (7th Cir. 2012). Inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference. That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering. *Goodloe* at 1031. The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment. Even a few days delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference. *Smith v. Knox County Jail,* 666 F.3d 1037, 1039-40 (7th Cir. 2012.) It is well established that a physician can violate the Eighth Amendment if a doctor persists with treatment that he knows to be ineffective. *LaBrec v. Lyon,*  2023 WL 6976738 at \*5 (WD WI 2023)

When Yates complained of new back and hip pain, on April 2nd, Hoffman ordered physical therapy. That therapy ended with an assessment that Yates' signs and symptoms were consistent with L4/5 herniation. However PT Hoechst did not refer Yates back to Hoffman. (YPFOF ¶ 59, 68, 72.)

When Yates wrote to Hoffman on June 27th, he was told he would be seen on a "scheduled basis." (Id. ¶ 73.) At this point Yates had been taking ibuprofen and acetaminophen for over 6 months and complaining of pain while taking it. (Id. ¶ 73a.) This should have alerted Hoffman

that Yates' existing medications were ineffective, especially when Hoffman states it only takes 2-3 weeks for an adequate trial of a medication. (Id. ¶ 105.) Hoffman admits that he did not consider Yates' condition to be serious enough to warrant seeing him despite his personal awareness of Yates' ongoing complaints. (Id. ¶ 47-48, 49, 59.)

Based upon these facts, a jury could reasonably infer that: Hoffman failed to exercise his professional judgement when he did not review Hoechst's assessment and refused to see Yates for two months *Leiser* at 19-20; Hoffman persisted with a course of treatment he should have known was ineffective. LeBrec at *5; Hoffman prolonged Yates' pain for two months for no penological purpose. *Gaston* at 631-32.

### Claim  C:  Hoffman did not follow DOC Policy when physically examining Yates

Summary judgement is improper and the claim should be submitted to a jury when evidence exists that the defendant knew better than to make the medical decision that he did. Standard treatment protocols can support an inference that the doctor knew better than to pursue the course of treatment that he did. *Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 658, 662-63 (7rh Cir. 2016). An action that "crosses the threshold into deliberate indifference is where a defendant fails to follow existing protocol" and permitting courts to use circumstantial evidence to evaluate treatment decision. *Leiser* at *16.

Hoffman should have known that DOC Policy calls for a comprehensive physical examination. (YPFOF ¶ 21-22.) Yates' August 26th appointment was for a follow-up on "low back pain, possible sciatica." Hoffman only performed one physical test for sciatica even though he was aware of multiple potential causes for sciatica. And when the straight leg raising test was negative Hoffman found this result surprising based upon the "bitterness" of Yates' complaints. Instead of investigation Yates' complaints further, he stopped testing and determined that Yates' physical exam did not suggest his pain was derived from a nerve issue. But instead of investigating Yates' complaints further, he simply stopped. (Id. ¶ 98-100, 100a, 82.)

According to LaVoie, there is a range of medically acceptable physical tests and the choice of examinations to be performed is left to the professional judgement of the ACP (Advanced Care Provider). (Id. ¶ 101a, 101b). Hoffman states that "purpose of the straight leg raising is to determine whether back pain is caused by a pinched nerve exiting the spinal column" (Id. ¶ 100) which is only one potential cause for Yates' sciatica pain.

Hoffman had no reason to stop testing after his first and only test was negative. Protocol calls for a comprehensive examination to identify the pain's source, there were other acceptable tests available, and there were several potential sources for sciatica pain that would require different

tests to identify them. And, Hoffman should have been aware that Yates' pain complaints were consistent with spinal stenosis. (Id. ¶ 99).

According to these facts, a jury could reasonably infer that: Hoffman failed to follow established DOC protocol by not conducting a more comprehensive physical examination; Hoffman's actions fell below the standards of care by not conducting additional tests after his first one was negative; and Hoffman did not use medical judgement when determining that only one test was sufficient to determine that Yates' pain was not derived from a nerve issue.

### Claim D:  Hoffman persisted with a treatment he knew was ineffective.

A physician's decision to persist with ineffective treatment and ignore a patient's repeated complaints of unresolved pain and other symptoms can give rise to liability -- or at the very least raise enough questions to warrant a jury trial. *Goodloe v. Sood,* 947 F.3d at 1028-29. State-of-mind evidence sufficient to create a jury question might include the defendant's persistence in "a course of treatment known to be ineffective." *Whiting* at 662-63. It is well established that a physician can violate the Eighth Amendment if he persists with treatment that he knows to be ineffective. *LaBrec,* 2023 WL 6976738 *5

On August 26th, Hoffman determined that Yates had an adequate trial of ibuprofen and acetaminophen. According to Hoffman, an adequate medication trial requires the drug to be taken as prescribed for 2-3 weeks. Hoffman decided to order duloxetine in tandem with them because Yates continued to complain of pain. When Hoffman did this his actions established that ibuprofen and acetaminophen were not an effective treatment for my pain. (Id. ¶ 104-05, 112).

Initially duloxetine lowered Yates pain from 7-8/10 to 5/10, but shortly thereafter, he reported its effectiveness was lessening and he was experiencing side effects from it (Id. ¶ 119, 128, 131). After Yates was seen by RN Wagner on September 13th, she talked with Hoffman and then noted that Hoffman had discontinued the duloxetine and said he wanted to see the MRI results. (Id. ¶ 132-34).

Hoffman admits that he did not personally see Yates or try to mitigate the side effects before stopping duloxetine and that he did not replace duloxetine at that time (Id. ¶ 136). This left Yates with only ibuprofen and acetaminophen, a treatment Hoffman determined to be ineffective less than 3 weeks earlier. (Id. ¶ 138).

After Yates asked Hoffman if it was his intent to not replace duloxetine (Id. ¶ 142, 145) Hoffman ordered amitriptyline on the 18th and scheduled it to start on September 23rd. (Id. ¶ 148). Yates took his first dose of amitriptyline on the 23rd. (Id. ¶ 162) and on the 26th he wrote noting

several problems and side effects he was having. He said that he did not want to continue taking a medication that left him out of touch with his thoughts, actions and surroundings. He asked if there was anything else that could be tried, preferably not another antidepressant. (Id. ¶ 167-70). Hoffman stopped the amitriptyline and noted that he had other anti-inflammatory options available, such as naproxen and meloxicam. He admits that he did not order them at that time and that NSAIDs were not his only medication option available. (Id. ¶ 171-73).

Despite reviewing Yates' MRI results on October 3rd, which objectively identified significant problems that Hoffman admits would explain Yates' pain complaints and its location (Id. ¶ 183). Hoffman continued to leave Yates with only ibuprofen and acetaminophen until October 10th, when he replaced ibuprofen with naproxen. (Id. ¶ 206). This was a medication that Hoffman had available to him on September 26th but he did not replace it earlier because he did not believe there was reason to do so. (Id. ¶ 196).

Based upon these facts, a jury could reasonably infer that Hoffman: Ignored Yates' pain; stopped both medications due to side effects and persisted with medications he knew were ineffective; and prolonged Yates' pain and suffering for no penological purpose.

**Claim E:  Huneke knowingly allowed Yates to go without medication**

Even if certain defendants, such as nurses, lack authority to provide particular forms of medical care, they still have an independent duty to ensure that inmates receive constitutionally adequate care by, for example, discussing their concerns with the treating physician or contacting a responsible administrator. *Nieto v. Dittman,* 2018 WL 1400957 *5 (WD WI 2018)(citations, quotation marks and internal edits omitted). Nurses, like physicians, may be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health. *Perez v. Fenoglio,* 792 F.3d 768, 779 (7th Cir. 2015)(citation omitted.)

On October 1st, Yates wrote Huneke nothing that he only had 2 ibuprofen left and asked for her help so that he would not be left without the only anti-inflammatory medication he had prescribed. (YPFOF ¶ 180.) Huneke replied noting his prescription could not be refilled until October 7th. (Id. ¶ 185.) Yates wrote back acknowledging that he inadvertently took extra ibuprofen while dealing with side effects from duloxetine and amitriptyline. He included several quotes from his journal to support this and noted that he was out of ibuprofen. He asked Huneke to consider letting his ibuprofen be refilled early. (Id. ¶ 186.)

Huneke was aware that Yates would be without ibuprofen for several days and she admits she was in her office on the 3rd and 4th. (Id. ¶ 192a.) Despite this, she did not respond until the 7th, noting that Yates' ibuprofen would be issued that day and admonishing him, saying he must be

aware of all his medications and how often he took them. She also stated concern over the potential for ibuprofen causing stomach problems, but showed no concern over the pain Yates was currently dealing with.  (Id. ¶ 192.)

Huneke admits that she did not contact anyone with prescriptive authority about the possibility of having Yates' prescription issued early. (Id. ¶ 160b.)

And on October 7th, Yates wrote Huneke about Hoffman's response stating he had other options for medications, naproxen and meloxicam, but 9 days later he had not ordered either of them. Yates asked her if there was anything she could do to help, and if reverting back to a treatment Hoffman knew was ineffective conformed to DOC policy. Huneke replied noting that what she could do to address Yates' immediate pain issues in her role as a nurse and HSU supervisor was to remind him of his current plan of care; and that she was confident Dr. Hoffman follows DAI policy and procedures as well as BHS medical practice guidelines. (Id. ¶ 195.)

According to these facts, a jury could reasonably infer that Huneke disregarded Yates' medical situation that was brought about by medications HSU had given him; that she ignored Yates request for help and thereby allowed Yates to go without his prescribed medication for several days; and that she prolonged his pain and suffering by knowingly leaving him without his medication.

**Claim F: Hoffman did not officially identify Yates' chronic condition**

On October 10th, after reviewing Yates' MRI results, he assessed Yates with chronic low back pain with sciatica, and noted Yates' complaints of pain were out of proportion to findings. (Id. ¶ 197.) Six days later, he submitted a Prior Authorization stating the Prior Auth Diagnosis was chronic low back pain with L5 radiculopathy and an abnormal MRI (Id. ¶ 223) which is a formal diagnosis. He also repeats this diagnosis on the injection order form. (Id. ¶ 233.)

DOC Policy regarding chronic conditions requires that patients identified with a new chronic condition be placed on the facility's significant illness list, and that the inmate's HCR chronic condition list be updated by the ACP. Chronic condition patients are required to have regularly scheduled visits and that documents in the HCR confirms that the ACP is following the protocols and Treatment Care Plans. (Id ¶ 18-20.) The chronic pain guidelines  are intended to assist in the assessment and management of patients with chronic pain. (Id. ¶ 21-23.) And the Treatment Care Plan indicates that "L4-L5 radiculopathy" is an appropriate diagnosis. (Id. ¶ 24.)

The Defendant's allege that the Policy's guidelines and protocols are only suggestions to be used

when a patient is diagnosed with a chronic condition. They admit that Hoffman did not diagnose Yates with a chronic condition and because of this, he was not required to follow the guidelines and protocols (Id. ¶ 223a, 223b.)

Hoffman identified Yates as having chronic low back pain with L5 radiculopathy but he did not enter this information into the HCR. And, there is no documentation in the HCR that confirms Hoffman was following the guidelines and protocols as required by policy.

Simply stated: Hoffman attempts to justify his claim that he was not required to follow the protocols and guidelines by admitting that he did not take the actions required by the policy that would have, in turn, required him to follow those protocols and guidelines.

According to these facts, a reasonable jury could infer that Hoffman failed to properly identify and document yates' chronic condition; that the failed to follow DOC Policy while assessing and treating Yates' condition; and that these failures prolonged Yates' pain and suffering for no penological purpose.

**Claim G:  Hoffman failed to properly classify Yates' condition**

An Urgent Care condition as an existing, necessary medical problem that is not an emergency, but could present a risk for serious bodily harm, disability, or further deterioration in the patient's condition that results in worsening health if the treatment delay is prolonged. (YPFOF ¶ 10.) Pain that radiates into the extremities implies a structural pinching of the nerves in the spine that might require surgery if the symptoms do not improve within weeks while using non-surgical treatments. (Id. ¶ 36.) Sciatica usually does not last more than 6 weeks, When it does, more involved treatments, including surgery, may be recommended. (Id. ¶ 44.) Sciatica can cause chronic long-term pain if an affected nerve is seriously damaged. Sciatica can also cause permanent nerve damage resulting in a loss of feeling in the affected leg. (Id at 46.) Patients with numbness for more than 3 months prior to surgery had worse leg pain and quality of life when patients that had surgery earlier. Thus, after 3 months, there will be notable permanent damage that surgery will not be able to correct. (Id. ¶ 52) Constant pressure of any type of living tissue will cause some residual damage. The longer the nerve is compressed and symptomatic, the more likely the nerve will not recover completely, even after successful surgery. (Id. ¶ 53.)

Hoffman should have recognized Yates' potential risk for permanent nerve damage based upon his going complaints consistent with nerve compression and contact. (Id. ¶ 73, 77, 80, 119, 142, 230-31) and his MRI results (Id. ¶ 182.) And he should have recognized that Yates' condition qualified as a Class II Urgent Care condition. Instead, he pursued a Class III-A Non-Urgent condition that allows for a delay of several weeks to months to be addressed (Id. ¶ 12) even

though it only takes 3 months for a nerve to be damaged enough to where surgery *may* not be able to correct it. (Id. ¶ 52.)

Hoffman should have also know that non-surgical treatments do not heal a herniated disc, it only relieves the symptoms while the body heals itself. (Id. ¶ 38.) And that when nerves are being directly contacted by bone spurs (Id. ¶ 54), surgery is the only remedy.

Based upon these facts, a jury could reasonably infer that Hoffman did not use professional judgement when classifying Yates' condition as Non-Urgent; and that he subjected Yates the risk of permanent nerve damage.

**Claim H: Unnecessary delays in scheduling prolonged Yates' pain and suffering**

DOC Policy requires facilities to schedule approved off-site appointments in a timely manner and ACPs to identify an appropriate time frame for all off-site appointments. (YPFOF ¶ 13.)

*Hoffman's involvement*

On Oct 11, HSU received Dr. Hughes neurosurgery consult response that recommended exhausting all conservative care options, including steroid injections. (YPFOF ¶ 217 ). Conservative care options are non-surgical and include medications and limiting activity levels. (Id ¶ 35). On Oct 16, Hoffman reviewed this recommendation and he submitted a Prior Authorization requesting a pain clinic referral. LaVoie received the Prior Authorization and approved it the same day. (Id ¶ 222, 227.) On Oct 29, Yates saw RN Wagner about his worsening symptoms, she then discussed them with Hoffman and afterwards, she noted that Hoffman was going to get a steroid injection ordered. The same day, Hoffman ordered a consult off-site Diagnostic Radiology, that states, "schedule a steroid injection for right L5 radiculopathy" and attached a UW Hospital and Clinics screening sheet. (Id ¶ 231-33).

Hoffman admits that he was aware of the Prior Authorization being approved before the 29th (Id. ¶ 225) and he states that Yates had a consult at UW Health and Clinics on the 29th. But, Yates was not consulted with nor are there any records indicating a consult for him on the 29th in the EMR. And, the records that Hoffman cites are his own orders for the injection. (Id ¶ 234). Simply stated, despite being aware that the Prior Authorization was approved, Hoffman waited 13 days to place the order, and he only did it then because RN Wagner consulted with him about Yates worsening condition. And he admits he was in his office every weekday during the 13 day period (Id ¶ 236) so there was no reason he could not have acted sooner.

Additionally, Hoffman erroneously states that he had no involvement with appointment

/3

scheduling and no control over the off-site provider's schedule or the institutions transport availability. (Id ¶ 237). But Hoffman actually had the ultimate control. He just chose not to exercise it even when he was required to set a timeframe for the appointment by DOC policy. Hoffman was required to set a timeframe for the injection, but admits he did not. And there is no documentation of anyone contacting him about obtaining the timeframe from him as required by DOC Policy. (Id ¶ 13, 15, 238).

Based upon the facts, a jury could reasonably infer that Hoffman failed to follow DOC Policy by not setting a timeframe for Yates' appointment; that he deliberately chose not to expedite Yates' appointment by setting a short timeframe for the appointment; and that this delay prolonged Yates' pain and suffering for no penological purpose.

*Huneke's involvement*

Huneke was responsible for overseeing off-site appointment scheduling, (Id. ¶ 17), and she admits her role as HSM was to supervise HSU and ensure that policies and procedures were being followed. She also states there are no records that indicate the scheduling process was not followed. (Id. ¶ 259, 262.)

On November 12th, Yates wrote Hoffman complaining that his symptoms continued to worsen. He asked if the injection had been scheduled yet. RN Dobbert replied that it was ordered and they were working on getting it scheduled. (Id. ¶ 240.)

The same day, MPAA Hams noted that she faxed the order to Gundersen despite having printed it on October 31st. (Id ¶ 241.) She also prepared an OSSR noting the date as November 12th, and that it was for a steroid injection. (Id ¶ 244.) This was the first time the order was sent to Gundersen and it was 27 days after LaVoie approved it. (Id ¶ 227.)

On November 13th, Yates wrote Huneke noting the scheduling delays and asking if the injection needed authorization before it could be scheduled. She replied, noting that speciality appointments are usually booked out-a-ways. (Id ¶ 245.) On November 25th, Yates wrote Huneke asking if the injection had been scheduled yet. She replied, noting that the Prior Authorization was still with LaVoie awaiting review but Hoffman sent the order to Gundersen and they will be calling back to schedule it. (Id ¶ 250.)

On November 27th, MPAA Hams noted that she left a message asking where Gundersen was with triaging the injection schedule. Later, she noted that she refaxed the order for steroid injection. (Id ¶ 256). There is no documentation in the HCR noting when the appointment was actually arranged. MPAA Hams noted the December 27th, appointment date on the OSSR, but

14

did not change the November 12th, date to reflect the date she refaxed the order. (Id. ¶ 257-58.) The appointment was scheduled within 30 days of the order being refaxed.

Both Huneke and LaVoie state that Yates injection was a non-urgent appointment, thus it could be scheduled at the availability of the parties involved. (Id ¶ 260, 264.) However, this justification fails because the availability of the parties does not become an issue until the order is submitted for scheduling. In this case, the appointment was scheduled within 30 days of it being re-faxed. The problem is it took 47 days to get it properly submitted. Hoffman sat on the approved Prior Authorization for 13 days before placing the order. MPAA Hams printed the order 2 days later, on October 31st, (Id ¶ 239), but did not submit it to Gundersen until November 12th. (Id ¶ 241.) And she did not follow-up on Gundersen's failure to respond to it until November 27th. (Id. ¶ 256.) And the most disturbing fact is that none of these actions took place until after Yates wrote asking if the injection was scheduled.

Huneke, the person responsible for overseeing off-site appointment scheduling and ensuring policies are followed - policies that require approved appointments are timely filed. (Id. ¶ 17.) states there is no specified number of days for Hoffman to prepare an order after it has been approved, or for MPAA Hams to submit the order for scheduling once it is written. (Id. ¶ 260). And LaVoie states that ultimately, the scheduling of off-site appointments depends on the unique facts and circumstances of each individual situation. (Id ¶ 263). But what they both ignore while trying to defend these delays, is the fact that DOC Policy requires the timely scheduling of approved appointments (Id ¶ 13-14) and that all communications between MPAA Hams and Gundersen regarding the scheduling of this appointment are to be documented in the EMR. And the Defendants admit that not all communications regarding yates' appointment scheduling are documented in the HCR. (Id. ¶ 264.)

The unique circumstances of this case would allow a jury to reasonably infer that: Yates' appointment was not timely scheduled as required by DOC Policy; That the EMR does not contain documentation that is required by DOC Policy; That Huneke failed to ensure that Hoffman and MPAA Hams actions were in compliance with DOC Policy; That Huneke's failure to properly oversee the off-site appointment scheduling contributed to the 47 day delay in scheduling Yates appointment; That Hoffman failed to set a timeframe for Yates injection as required by DOC Policy; and That the 47 day delay unnecessarily prolonged Yates pain and suffering for no penological purpose.

### Claim I: Hoffman maliciously ignored Yates' condition

It is well established that a physician can violate the Eighth Amendment if a doctor persists with treatment that he knows to be ineffective. *LaBrec,* 2023 WL 6976738 at *5. Summary judgement

is improper and the claim should be submitted to a jury when evidence exists that the defendant knew better than to make the medical decision that he did. *Whiting,* 839 F.3d at 662-63.

On January 14th, Yates wrote Hoffman saying he had just received Pomranke's recommendation. He asked if it was Hoffman's intent to leave him in pain without trying to alleviate it, especially when reasonable options are available. Hoffman replied stating, "Previous trials of anitriptyline and duloxetine were jokes. I am not amused. If you wish a real trial of these medications, as required by DOC protocol, let me know at your earliest convenience." (YPFOF ¶ 294.)

Hoffman had no basis upon which to medically determine Yates' previous trials were anything because both times that Yates complained of side effects to these medications, Hoffman refused to see or even talk with Yates about them before he chose to stop them. (Id. ¶ 298b, 301.) For him to say later that they were jokes cannot be based upon any form of professional judgement, it can only be based on speculation.

On January 16th, Yates wrote Hoffman and included copies of his journal that documented his experiences while taking duloxetine and amitriptyline to ensure that Hoffman understood exactly what he had experienced. Yates assured Hoffman that his experiences were no jokes. (Id. ¶ 307.)

On January 17th, Hoffman contacted Gary Kessel and erroneously claimed that Yates had been "persistently insisting" that he give [Yates] gabapentin for his severe pain." Hoffman stated it was his personal belief that he was "being played" because Yates did not tolerate amitriptyline or duloxetine and he "stated many side effects." He then asked how rigid the requirements were to "have a decent trial" of amitriptyline and duloxetine and stated "I am hoping it is very rigid. Otherwise, I have more than one who will be or are agitating for the gabapentinoids. (Id. ¶ 309.)

Kessel responded stating that gabapentin was now non-formulary and it is no longer a criteria medication. He noted that there is a specific gabapentin non-formulary request that now requires more details and makes it more difficult for approval, "so the requirements have gotten more rigid." (Id. ¶ 310.)

After receiving Kessel's response, Hoffman replied on Yates' HSR stating, "Gabapentin and Lyrica are both non-formulary. Requirements are rigid. The intent is to not have them prescribed in the DOC" (Id. ¶ 311.)

Based upon these facts, a jury could reasonably infer that: Hoffman's response to Yates' request was a malicious indication of his state of mind; the statements Hoffman made to Kessel were false and misleading and indicated that he had no intention of following Pomranke's recommendation; Hoffman's belief that he was "being played" was unfounded and not based

upon professional judgement; and that Hoffman was basing Yates' individual medical needs upon the DOC' perception that inmates only ask for gabapentin so they can abuse it.

**Claim J: Hoffman's adherence to DOC Policy violated Yates' Eighth Amendment rights**

The Chronic Disease Management - Chronic Pain guidelines state that the goal is to improve function and treatments should be directed toward that goal. Curing or resolution of pain should never be a goal. (YPFOF ¶ 21.) Hoffman's signed Job Description states that the physician shall comply with the Department's administrative rules and the Agencies policies and procedures. (Id. ¶ 26.)

Throughout the RTP, Hoffman's actions were consistent with DOC Policy that required him to treat Yates for functionality rather than pain. (Id. ¶ 21.)  His entire defense is predicated upon his determination that Yates' functionality discredited his complaints of pain. And his actions were deliberately intended to ensure that Yates' complaints of pain were discredited and unacknowledged.

Hoffman minimized and ignored significant MRI findings and documented an observation of Yates that never happened in order to determine Yates' complaints of pain were out of proportion to findings. (Id. ¶ 198-99, 201.) And most notably, after Pomranke determined that Yates had significant pain and recommended gabapentin, Hoffman states that "we treat with medications to a level of function. [Yates's] functionality - that is, his ability to move independently - was adequate. Progressing to drugs of abuse  would not improve function, which was already good."

Hoffman obdurately refused to consider or even acknowledge Yates' pain and insisted upon limiting his treatments to Yates' functionality (Id. ¶ 312b) despite being aware of Yates' pain and the effects it was have on his life. In short, Yates' pain, his inability to sleep, work, think clearly and interact socially, were irrelevant as long as he was functional.

Instead of attempting to alleviate Yates' pain - not cure or resolve it, merely alleviate it - Hoffman continued to treat Yates with medications that were not indicated for his condition. (Id. ¶ 302a.) He states that he did not believe that other medications were medically necessary. (Id. ¶ 295.)

Hoffman treated Yates in accordance with DOC Policies' stated rationale that inmates seek and abuse gabapentin to abuse it themselves or they are extorted by others to obtain it. He treated Yates as if he was just another inmate seeing drugs to abuse them, despite the fact that all treatment decisions are supposed to be based upon the individualized needs of the patient.

According to these facts, a jury could reasonably infer that Hoffmann intentionally ensured that

his examinations and observations of Yates all showed that he was functional in order to discredit his complaints of pain; and that once Hoffman deemed that Yates was functional, he then ignored and dismissed Yates' complaints and left him to suffer in pain for no penological reason.

## 2. The Defendants are not entitled to Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

The Eighth Amendment right to be free from cruel and unusual punishment is well established law. *Estelle v. Gamble,* 429 U.S. 97, 102-04 (1995). Both Hoffman and Huneke should have been that they were violating Yates' rights and thus, they are not entitled to the affirmative defense of qualified immunity. Yates has presented evidence directly disputing their claims and these disputed facts must be determined by a jury. Therefore, until these disputes are resolved, it would be premature to grant the Defendants qualified immunity.

## 3. Summary

Hoffman consistently ignored and minimized Yates' pain complaints by determining that Yates was functional. His actions throughout were consistent with DOC Policy that requires physicians to treat for function rather than pain. He refused to do a comprehensive physical examination, made up observations of events that did not occur, and persisted in treating Yates according to the DOC's philosophy that all inmates are lying, drug abusers that are only after "drugs of abuse."

While Huneke, the person responsible for ensuring DOC Policies were being followed, states there are no records that would show these policies and procedures were not followed. This is not surprising when the majority of the documentation that DOC Policy requires to be in the HCR was never entered. And when it was pointed out that Yates' appointment still had not been scheduled, she covered it up by passing the blame onto LaVoie.

As their own facts show, Yates' pain was ignored, he was treated with medications that are not indicated for the objectively established condition, forced to endure constant intense pain while a misclassification of his condition and unnecessary scheduling delays prolonged his pain and suffering, and then he was told his experiences were "jokes" and that the doctor was "not amused."

**4. Conclusion**

For all the reasons stated above, Plaintiff Yates respectfully requests that the Court deny the Defendant's motion for summary judgement.

Respectfully submitted September __16th,__ 2024.

Michael Yates

WI DOC #349130
Jackson Correctional Institution
P.O. Box 233
Black River Falls, WI 54615