IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL YATES,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | 22-cv-472-wmc |
| DR. KARL HOFFMAN,<br>ROSLYN HUNEKE, and<br>DR. DANIEL LAVOIE, | | |
| | Defendants. | |

Representing himself, plaintiff Michael Yates filed a civil rights complaint under 42 U.S.C. § 1983, claiming that the defendants denied him adequate and timely medical care for chronic lower back pain during his incarceration by the Wisconsin Department of Corrections ("DOC"). The court granted Yates leave to proceed with Eighth Amendment claims against these defendants. Specifically, the court granted Yates leave to proceed with claims that Dr. Karl Hoffman and Health Services Manager ("HSM") Roslyn Huneke took no meaningful steps over eight months to soothe his chronic pain or ensure a prompt diagnosis or treatment. (Dkt. #5, at 3-4.) The court also granted Yates leave to proceed with his claim that Dr. Daniel LaVoie unreasonably delayed approval of an authorization request for a steroid injection for 40 days. (Dkt. #22.) Pending before the court is the defendants' motion for summary judgment on the grounds that: (1) Yates has not met his burden of proof to show his medical care was constitutionally inadequate; and (2) alternatively, defendants are entitled to qualified immunity. (Dkt. #61.) For the reasons explained below, defendants' motion will be granted.

UNDISPUTED FACTS[1]

Plaintiff Michael Yates is currently incarcerated at Jackson Correctional Institution. At all times relevant to the complaint, however, he was incarcerated at the New Lisbon Correctional Institution ("NLCI"), where defendants Hoffman and Huneke were employed.  As the HSM and a registered nurse, Huneke provided administrative support and direction for the NLCI Health Services Unit ("HSU").  However, because her position was mainly administrative, she typically did not provide medical care to inmates, which was instead the responsibility of other HSU nursing staff and advanced care providers ("ACPs"), such as Dr. Hoffman.  As for defendant LaVoie, he was then the Associate Medical Director for the DOC Bureau of Health Services, and supervised physicians who worked in DOC facilities, but did not provide medical care directly to inmates during the period relevant to plaintiff's complaint.

In January 2019, Dr. Hoffman responded to Yates' general complaints of back pain by prescribing acetaminophen, 650 mg up to four times a day, as a "Keep on Person" or "KOP" medication, meaning that Yates could keep this medication in his cell.

---

[1] Unless otherwise noted, the following facts are undisputed as drawn from the parties' proposed findings of fact and supporting evidence, which is viewed in the light most favorable to plaintiff as non-movant.  Because many of plaintiff's responses to defendant's proposed findings of fact are argumentative, conclusory, or unsupported by competent evidence, plaintiff has failed to comply with the court's procedures on summary judgment, which were provided to all parties during the preliminary pretrial conference.  (Preliminary Pretrial Packet (dkt. #15) Proc. to be Followed on Mot. For Summ. Judg., §§ I-II).  As a result, the court treats those facts as undisputed.  (*Id*. § II(C)); *Hedrich v. Bd. of Regents of Univ. of Wis. Sys*., 274 F.3d 1174, 1178 (7th Cir. 2011) (courts are to consider only evidence set forth in proposed finding of fact with proper citation); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (disregarding at summary judgment factual "submissions that [merely] make legal arguments and assert legal conclusions").

Acetaminophen is an analgesic designed to treat or manage pain by reducing inflammation or changing the way the brain processes pain.  One month later, in February 2019, Dr. Hoffman further prescribed Yates ibuprofen, 800 mg to be taken twice a day as needed for pain, also as a KOP medication.  Ibuprofen is a nonsteroidal anti-inflammatory ("NSAID") medication designed to reduce pain, fever, and other types of inflammation.

According to Dr. Hoffman, the overall goal of pain management is to maintain a patient's functionality through medication and non-medication-based interventions in the least restrictive way possible, so that they may maintain their lifestyle.  Hoffman explains that when treating complaints of pain it is important to evaluate whether "lower-level medications" like analgesics and NSAIDs are effective in treating that pain before prescribing more advanced (*i.e.*, stronger) medications.  Thus, it is a common medical practice to begin a patient with complaints of pain on a more easily accessible medication (such as acetaminophen or ibuprofen) before prescribing more advanced pain management medications.  This is done mainly to address a patient's complaints of pain on the lowest dose and least intensive pain mediation possible, but is also important in a prison setting, where certain medications have a higher potential for abuse or diversion among the inmate population.

Dr. Hoffman also explains that prescribing pain medication is patient-dependent, meaning that medications are prescribed based on that individual's condition, allergies, and symptoms.  Thus, acetaminophen and ibuprofen are considered the best front-line defense for addressing complaints of pain for patients because these medications are easily accessible and do not generally cause significant side effects.  Dr. Hoffman concluded that

3

these two medications in tandem were appropriate options for Yates when he initially complained of pain in January and February 2019.

On April 2, 2019, Yates had a separate appointment with Dr. Hoffman to discuss his thyroid status and hypertension. During that appointment, Yates informed Dr. Hoffman that he was experiencing pain when moving his right hip. Yates indicated that he had been experiencing pain in his hip for a few months. Dr. Hoffman ordered a consultation with a physical therapist to assess Yates' complaints of hip pain. That same day, Yates was scheduled for a physical therapy assessment.

On May 7, 2019, Yates was next evaluated by a physical therapist, who indicated that Yates' condition was appropriate for physical therapy and provided him with a treatment plan. In particular, Yates was given a home exercise program that featured stretching, but also had six weekly sessions with the physical therapist.

Initially, Yates reported some improvement with physical therapy. During his final sessions with the physical therapist, however, Yates indicated he was continuing to experience pain in his hip and back with little to no improvement from the first visit, despite performing his home exercise program five to seven days per week. Still, the physical therapist noted at each of the sessions that Yates "appear[ed] in no apparent distress." The physical therapist also noted that Yates' reported complaints of lower back pain were "vague" and "somewhat questionable," as he was continuing his physical therapy exercise regimen. After their final session on June 25, 2019, the physical therapist concluded that Yates was not progressing as planned and had not met the goals of physical therapy. Accordingly, the physical therapist's plan was for Yates to follow up with a

primary care physician regarding his symptoms, which were "consistent with L4/5 herniation."

DOC inmates who have medical needs are instructed to submit a written Health Service Request ("HSR") with specific information regarding the nature of their concern. HSU nursing staff triage these HSRs each day and respond accordingly. If the inmate's concern requires an appointment with a medical provider, nursing staff will schedule the appointment. Inmates generally see a nurse first, who may then refer the inmate to see an ACP, such as the institution physician. Although nurses do not have authority to prescribe medication or make diagnoses, they rely on established nursing assessment protocols to help guide the care they provide and interventions they recommend. Further, if nursing staff evaluate an inmate patient and determine that further medical care is necessary, they may also discuss the inmate's condition with another ACP, who can order additional treatment or make recommendations, or order them to be seen by an ACP based on the inmate's symptoms, the nurse's evaluation, and other potential constraints -- such as the ACP's availability. After evaluation by an ACP, it may even be determined by the provider that the inmate requires an appointment at an offsite facility for further evaluation or treatment, because it cannot be completed onsite. However, only ACPs can place an order for an inmate to be seen at an offsite facility.

On June 27, 2019, Yates submitted an HSR directed to Dr. Hoffman, informing him that he had finished his physical therapy for his hip and low back pain, but with no noticeable results or improvement. Although nurses typically respond to HSRs, Dr. Hoffman replied on June 28, 2019, that he would see Yates on a "scheduled basis" and

5

entered an order of referral "to primary care" for his complaints of low back pain.  Yates submitted three inquiries to the HSU during July 2019, asking when he would be seen. Nursing staff responded to each correspondence, informing Yates that he was scheduled to be seen by a primary care provider.

On August 6, 2019, Yates submitted another HSR renewing complaints of back pain.  He was seen by a nurse the same day.  Yates advised the nurse that he had injured his back previously in 1982, stated that physical therapy did not help with his lower back, and indicated that his pain was increasing and was running down his leg.  Nursing staff consulted Dr. Hoffman, who ordered an MRI of Yates' lumbar spine.

On August 26, 2019, Dr. Hoffman saw Yates for his scheduled appointment with a primary care provider to address his low back pain and reevaluate his treatment plan. Based on Yates' complaints, Dr. Hoffman noted the possibility of sciatica or L4-L5 disc herniation, which occurs when the discs between the fourth and fifth lumbar vertebrae in the spine are damaged or a nerve is compressed.  Disc herniation can cause sciatica, which refers to nerve pain that travels along the path of the sciatic nerve, from an individual's lower back into the buttocks and down each leg.

During this appointment, Dr. Hoffman conducted a physical examination to rule out a pinched nerve and tested the range of motion in Yates' hips.  Dr. Hoffman observed that (1) Yates' level of functionality did not appear impacted by his complaints of pain, and (2) his physical examinations did not yield any significant results.  Because Yates had what Dr. Hoffman determined to be an adequate trial of both acetaminophen and ibuprofen, he offered to add a low dose of duloxetine to treat Yates' pain in tandem with

those existing medications. Duloxetine is a selective serotonin and norepinephrine reuptake inhibitor ("SNRI"), which works to block the reabsorption of serotonin and norepinephrine into nerve cells. SNRIs have been proven effective in treating chronic, long-lasting pain. Similar to NSAIDs, duloxetine is also a lower-level pain reliever. By prescribing duloxetine, Dr. Hoffman wanted to evaluate whether a different classification of medication that worked differently from the other previously prescribed medications would manage his pain effectively. Dr. Hoffman explains that this was done to address Yates' complaints of pain while avoiding a more advanced pain medication when his functionality did not require it.

On August 29, 2019, Yates had his first dose of duloxetine. On September 2, 2019, Yates reported in correspondence that the duloxetine *was* helping. HSM Huneke responded by encouraging Yates to continue with his plan of care, informing him that the advice and direction he had received from nurses and physical therapy were appropriate for his condition, and that back pain can be difficult and persistent. In a separate letter, Huneke also confirmed that Dr. Hoffman had ordered an MRI and would see Yates after the results came back.

Unfortunately, on September 11, 2019, Yates reported in an HSR that the duloxetine's effectiveness had lessened. Dr. Hoffman responded by encouraging Yates to continue to take the medication as prescribed for an additional two weeks to better evaluate its effectiveness. However, on September 12, 2019, Yates submitted another HSR, reporting adverse side effects. The next day, Yates was seen by nursing staff, who discussed his issues with Dr. Hoffman. With dwindling reported effectiveness and adverse side

7

effects, Dr. Hoffman then discontinued the duloxetine.

A few days later, on September 15, 2019, Yates wrote a letter to Huneke, complaining more generally of a delay in treatment for his back, hip, and leg pain.  On September 18, 2019, Yates again submitted an HSR, complaining that his pain had increased since the duloxetine had been discontinued.  In response, Dr. Hoffman explained his reasoning for discontinuing the duloxetine and offered him a prescription for amitriptyline, a tricyclic antidepressant that can be used in low doses to treat neuropathic pain in a manner like duloxetine.  Dr. Hoffman placed the order for amitriptyline on September 18, 2019, to commence on September 23.

On September 19, 2019, HSM Huneke also responded to Yates' September 15 letter, explained that Dr. Hoffman's schedule was booked for several weeks, and encouraged him to follow his treatment plan.  In particular, Huneke noted that Yates had just been seen by Dr. Hoffman on August 26 and by nursing staff on September 12.  She also noted that he was taking acetaminophen and ibuprofen, in addition to his physical therapy exercises, *and* utilizing a TENS unit for his pain.  In Huneke's opinion, therefore, Yates' condition was stable and non-emergent.  Huneke further noted that an MRI had been scheduled along with a follow-up appointment with Dr. Hoffman.  Finally, Huneke reminded Yates that letters were not the proper method of communicating with the HSU and to submit an HSR in the future if he had any new or worsening symptoms to report.

On September 19, 2019, Yates wrote another letter to Dr. Hoffman, informing him that he had been told there was a topical cream designed to block nerve pain, and asking if it was available to try before his taking amitriptyline.  In response, Dr. Hoffman informed

Yates that he had ordered a topical medication (lidocaine) for him, but would still recommend he start the low dose of amitriptyline, as well.

Yates received both the lidocaine cream and his first dose of amitriptyline on September 23, 2019. Several days later, however, Yates reported to Dr. Hoffman that the amitriptyline was also producing adverse side effects, despite the low dosage. In response, Dr. Hoffman discontinued the amitriptyline, although also noting that Yates had failed to complete an adequate trial of that medication to evaluate its possible effectiveness. Dr. Hoffman noted further that, given the low dosage prescribed, amitriptyline was unlikely to be causing any severe adverse side effects. Dr. Hoffman also wrote back to Yates on September 27 and offered to try yet another anti-inflammatory medication, like naproxen or meloxicam.

On October 1, 2019, Yates finally received an MRI of his lumbar spine at Mile Bluff Medical Center in Mauston. On October 3, Dr. Hoffman reviewed the offsite provider's notes, indicating that Yates had a right lateral recess disc protrusion at L4-L5, and disc disease at L5-S1, with possible compression of the L5 nerve root.

On October 10, Yates then had a follow-up appointment with Dr. Hoffman. During that appointment, Yates commented that ibuprofen made no noticeable difference in his pain, and stated that he would like to try a different anti-inflammatory, such as naproxen, which he had taken in the past without side effects. However, because Yates walked without any obvious signs of discomfort, and got up and down from the exam table without incident, Dr. Hoffman believed that Yates was not in significant pain. Indeed, Dr. Hoffman noted that Yates' general ease of movement suggested that his complaints of pain

9

were out of proportion to the findings of the MRI, as well as his own physical examination.

Nevertheless, Dr. Hoffman ordered a neurosurgery consultation to further evaluate Yates' condition.  In the meantime, to the extent that Yates continued to complain of pain, Dr. Hoffman continued to believe that trials of more conservative options, such as acetaminophen combined with anti-inflammatories, were appropriate.  Accordingly, Dr. Hoffman discontinued Yates' prescription for ibuprofen but prescribed naproxen at 500 mg twice per day, alongside his prescription for acetaminophen.  Naproxen is another NSAID medication designed to treat pain and inflammation caused by various conditions, including muscle and back pain.  Dr. Hoffman prescribed Yates the highest dosage of naproxen allowed under DOC's standards, which he felt was appropriate as a next level of medication above ibuprofen given that Yates' functionality did not appear significantly impacted by his reports of pain.  Plus, Dr. Hoffman did not want to overprescribe him with a higher-level medication that was not necessary.

Consistent with Dr. Hoffman's directions, HSU staff also sent Yates' medical file to the Gundersen Health System Neurosurgery Department in La Crosse for an evaluation and recommendation for a course of treatment for his back pain and MRI diagnosis.  On October 11, 2019, the HSU received a fax from a neurosurgeon at Gundersen Health System, who reviewed Yates' records and also recommended that he exhaust all conservative care options, including steroid injections, before considering surgery.  Dr. Hoffman reviewed this correspondence on October 16, 2019, and submitted a prior authorization request to the DOC Class III Committee or Medical Director for a pain clinic

referral that same day.[2]  Dr. Hoffman made that request so Yates could be seen at UW Hospitals and Clinics for a second opinion on the necessity of the steroid injection procedure, which could not be performed onsite at NLCI.  While Dr. LaVoie approved that request that same day, he had no further involvement with Yates' care.

On October 21, 2019, Yates submitted an HSR indicating that unless he was standing or walking a lot, the naproxen prescription had reduced his pain level.  After Yates requested a higher dosage, however, nursing staff informed him that he was already at the highest dose allowed under DOC protocols and the dosage could not be increased.  On October 29, Yates also had a consultation for a steroid injection at the UW Health pain clinic.  The provider who screened Yates documented the treatment he had already received and approved him for "3 consecutive injections as needed."  That same day, Dr. Hoffman ordered a steroid injection to treat L5 radiculopathy.  Although Yates had assumed that the prior authorization for the pain clinic consultation meant he would receive the injection on that same day, Dr. Hoffman clarified that the prior authorization was for a consultation with the pain clinic to determine whether steroid injections were necessary.

On November 12, 2019, Yates then submitted an HSR asking when his steroid injection would be scheduled.  Nursing staff informed him that while ordered, staff were still working to get the procedure scheduled with an offsite provider.  Neither HSM

---

[2] According to Dr. LaVoie, the Class III Committee makes determinations about offsite medical treatment for "non-urgent" medical services, in contrast with Class I and II requests that are "urgent," where a delay in treatment could cause life-threatening injury to the patient and do not require prior approval by a designated authority to be completed.  Although prior authorization was not required for the pain clinic consultation, Dr. LaVoie noted that there were circumstances in which ACPs would submit prior authorization requests "out of an abundance of caution or due diligence."

Huneke nor Dr. Hoffman were involved in scheduling appointments with offsite providers, which were handled by the Medical Program Assistant Advanced ("MPAA"). An order for the steroid injection was faxed to the offsite facility on November 12, and it was noted that the facility would call back to set up the appointment. An order for a steroid injection was also re-submitted by fax on November 27, 2019, and the procedure was scheduled for December 27, 2019, at a Gundersen Health System facility.

On December 4, 2019, Yates wrote to Dr. Hoffman, reporting that naproxen reduced his pain to a point, but he was still experiencing pain after 9 hours because the naproxen wore off. In response to that letter, Yates was seen by nursing staff on December 5. Staff again observed that Yates ambulated at a normal pace with no noticeable difficulties. During that appointment, Yates indicated that he was willing to try meloxicam for his complaints of pain, another NSAID that is more potent and longer lasting than naproxen. Accordingly, Dr. Hoffman prescribed Yates meloxicam at 7.5 mg twice per day as a replacement for naproxen. On December 18, however, Yates wrote to Dr. Hoffman and advised that the switch from naproxen to meloxicam had made no difference in his pain levels. While Dr. Hoffman then offered to prescribe him ibuprofen four times per day, Yates responded on December 26 that he did not want a prescription for ibuprofen, noting again that the naproxen and meloxicam reduced but did not eliminate his pain.

On December 27, 2019, Yates had an offsite appointment at Gundersen Health System Neuroscience with physician's assistant ("PA") Natalie Pomranke. While Dr. Hoffman's intention was that Yates would receive a steroid injection during the same appointment, this did not occur. Instead, Pomranke treated the appointment as a

12

"consult," recommended that Yates receive a lumbar epidural steroid injection, and placed orders for that procedure to be done. If the lumbar epidural steroid injection was pursued, Pomranke added that Yates should have a follow-up appointment to determine its effectiveness and any next steps. If Yates' symptoms continued to be significant, Pomranke further recommended that a trial of neuropathic pain medication, such as gabapentin or Lyrica (pregabalin), would be reasonable.

On December 30, 2019, Dr. Hoffman reviewed Pomranke's recommendations, learning that Yates had not, in fact, received a steroid injection during the December 27 appointment. Dr. Hoffman explains that when an offsite appointment is scheduled for a procedure to be conducted, the decision to conduct the procedure is at the discretion of the offsite provider. However, DOC medical staff do not have the authority to direct the medical care provided at an offsite facility. Thus, although Dr. Hoffman had ordered a steroid injection for Yates and intended it to occur on December 27, Dr. Hoffman had no control over the offsite provider's actions or decisions.

Consistent with Pomranke's recommendation, Dr. Hoffman ordered a lumber epidural steroid injection on January 8, 2020, but did not order a prescription for neuropathic pain medication, such as gabapentin or pregabalin, because neither are listed in the DOC formulary, which is a list of prescription and non-prescription medications that are ordinarily available to authorized prescribers. When a drug is not listed on the formulary, an ACP must submit a request for non-formulary drug approval. Gabapentin is used to treat seizure disorders but is also used to treat nerve pain, which is considered an "off-label" use. Thus, gabapentin is a non-formulary medication when prescribed to

13

treat any condition other than a seizure disorder.

Dr. Hoffman explains further that gabapentin is problematic in the prison setting because it has the potential for abuse and diversion. Inmates will often snort gabapentin to get a high similar to valium, which can lead to health, safety, and security risks. While this is sometimes done by the inmate with the prescription, it is also common for inmates to sell or be extorted for their gabapentin prescriptions. Because of these issues, DOC required medical providers to use a special form for approval of prescriptions of gabapentin and pregabalin. The criteria for approval included the failure of first-line treatments for pain, such as ibuprofen, NSAIDS, amitriptyline, and duloxetine.

Dr. Hoffman states that he did not prescribe gabapentin or pregabalin for Yates in particular because of its potential for misuse in the correctional setting, as well as a number of other reasons. *First*, the offsite treatment provider (PA Pomranke) recommended that steroid injections be administered before considering neuropathic pain medication, such as gabapentin or pregabalin. *Second*, although Yates had been prescribed NSAIDs, amitriptyline, and duloxetine, as required for the criteria for requesting gabapentin, he had not completed adequate trials of these medications to determine their effectiveness. *Third*, Dr. Hoffman and other medical providers observed that Yates had a high level of functionality, despite his complaints of pain, and did not show obvious distress during appointments. *Fourth*, and finally, Yates had an ongoing course of treatment through various medications and, although he indicated that the medications were ineffective to treat his pain, his functionality did not support his claims.

On January 14, 2020, Yates wrote a letter to Dr. Hoffman, expressing that he was

14

in pain and asking if he could be prescribed gabapentin or pregabalin, as recommended by PA Pomranke.  Dr. Hoffman interpreted the request as a warning sign that Yates may be drug seeking for gabapentin or pregabalin.  Regardless, Dr. Hoffman responded that neither gabapentin nor pregabalin could be considered because Yates had not completed adequate trials of duloxetine or amitriptyline, as required by DOC guidelines.  Defendant Huneke also responded by informing Yates that an adequate trial of these medications was typically two to three months, and DOC Bureau of Health Services had guidelines that physicians must follow for treating chronic conditions.

On February 3, 2020, Yates finally received an L4-L5 interlaminar epidural steroid injection at Gundersen Health System.  On February 13, Dr. Hoffman reviewed the offsite report and noted that Yates tolerated the procedure well.  On February 17, Yates had a follow-up appointment with PA Pomranke.  During that appointment, Yates reported that his pain intensity was markedly improved since the injection, although he still had some discomfort with activity.  Pomranke noted that Yates appeared to rise easily from a seated position and his gait was normal.  Pomranke recommended that Yates receive a repeat lumbar epidural steroid injection, additional physical therapy, and if his symptoms continued to be significant, a trial of neuropathic pain medication.   Yates did not submit any other HSRs regarding complaints of back pain after his steroid injection in February 2020.

OPINION

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that:  someone deprived him of a right secured by the Constitution or laws of the United

15

States, and whoever deprived him of this right was acting under the color of state law.  *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)).  Here, plaintiff alleges that Dr. Hoffman, HSM Huneke, and Dr. LaVoie violated his rights under the Eighth Amendment by failing or refusing to provide him with adequate pain medication or other treatment for his back pain.  The defendants have moved for summary judgment, arguing that plaintiff has no evidence from which a reasonable jury could find such a violation.  The defendants argue further that they are entitled to qualified immunity.

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact[,] and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (alteration adopted and quotation marks omitted).  At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017).

Although pro se litigants are entitled to liberal construction of their pleadings, they, too, have the burden to come forward in response to a motion for summary judgment with evidence that demonstrates a genuine issue of material fact.  *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) ("[A plaintiff's] pro se status doesn't alleviate his burden on summary judgment.") (citation omitted).  Further, while the court views the record "in the

light most favorable to the nonmovant and constru[es] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017), or upon "[c]onclusory statements, not grounded in specific facts," *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016). Here, there is simply no evidence that defendants' ongoing treatment ever departed from standard protocols to address plaintiff's chronic back pain through gradually increasing the extent of medical interventions, particularly in a prison setting, however frustrating that may have understandably been for plaintiff.

## I. Claims Under the Eighth Amendment

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). Specifically, "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id*. at 104 (quotation marks and citation omitted). To prevail on a claim of constitutionally inadequate medical care an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent to the risks presented by that condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett*, 658 F.3d, at 750.

Defendants do not dispute that plaintiff's chronic back pain was an objectively serious medical condition, but argue that there is no evidence that they acted with

17

deliberate indifference.  "Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it, which is a decidedly high standard.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Specifically, acts of deliberate indifference require more than negligence, or even gross negligence, but require something less than purposeful acts.  *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994).  The threshold for deliberate indifference is not met unless: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837.  The evidence here does not begin to reach this threshold

### A. Claims Against Dr. Hoffman

Plaintiff was granted leave to proceed with claims that Dr. Hoffman took no meaningful steps to alleviate his chronic back pain for a period of eight months, until he finally received a steroid injection in February 2020.  The undisputed medical records show, however, that Dr. Hoffman provided treatment throughout the relevant time period.  To the extent that plaintiff claims that Dr. Hoffman provided constitutionally deficient treatment, that claim is "a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'"  *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)).  In such cases, courts must defer to a medical professional's treatment decision "unless 'no minimally competent professional would have so responded under those circumstances.'"  *Pyles v. Fahim*, 771

18

F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

Although plaintiff alleges that defendant Dr. Hoffman took no steps to treat his back pain until he received a lumbar epidural steroidal injection in February 2020, it is undisputed that Hoffman prescribed plaintiff several different pain medications, including acetaminophen and ibuprofen, as well as referring plaintiff for a six-week course of physical therapy. Moreover, when physical therapy and basic pain medications failed to address plaintiff's needs and his symptoms indicated possible L4-L5 herniation, Dr. Hoffman also ordered an MRI to diagnose his condition and offered stronger prescriptions for duloxetine and amitriptyline to manage his pain, in addition to granting plaintiff's request for the topical cream lidocaine. When plaintiff indicated that he was unable to tolerate low doses of duloxetine or amitriptyline after only a short trial, Dr. Hoffman further offered prescriptions for naproxen and then meloxicam to treat his nerve pain. And when that proved insufficient, Dr. Hoffman ordered a neurosurgery consultation after reviewing the results of plaintiff's MRI, in order to assess the severity of his condition, to be followed by an authorization request for an assessment at the UW Health pain clinic. Once Dr. Hoffman received confirmation that a steroid injection was approved to treat plaintiff's chronic back pain, Dr. Hoffman also promptly ordered the steroid injection to take place at an offsite provider. While the offsite provider did not perform the steroid injection at the scheduled appointment on December 27, 2019, the procedure was ordered as recommended by the offsite provider, and took place on February 3, 2020. Finally, while Dr. Hoffman had intended the steroid injection to take place on December 27, 2019, the

delay was through no fault of Hoffman, who had no control over scheduling delays or the offsite provider's treatment decisions.

In short, Dr. Hoffman's decision to provide lower level pain relief, physical therapy, and other conservative treatment measures to plaintiff before ordering an MRI and a pain-clinic consultation for a steroid injection reflects professional judgment, not deliberate indifference. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."). Similarly, Dr. Hoffman's decision to order the steroid injection, which was delayed at the offsite provider's discretion, fails to show that he was deliberately indifferent to plaintiff's needs. *Id.* Plaintiff has presented no evidence that Dr. Hoffman knowingly persisted in a course of ineffective treatment. *See Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). Nor does plaintiff otherwise present any evidence from which a reasonable jury could conclude or infer that Dr. Hoffman's treatment decisions were "so blatantly inappropriate as to evidence intentional mistreatment," *Snipes*, 95 F.3d at 592, or were "such a substantial departure from accepted professional judgment, practice, or standards," as to support a constitutional claim. *Brown v. Osmundson*, 38 F.4th 545, 551 (7th Cir. 2022) (citations omitted). As a result, Dr. Hoffman's treatment decisions based on medical judgment are entitled to deference and do not constitute deliberate indifference as a matter of law. *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021); *see also Snipes*, 95 F.3d at 591 ("Medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment,' *Estelle*, 429 U.S. at 107, such as

whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview.").

While plaintiff appears to claim that Dr. Hoffman should have prescribed naproxen or a neuropathic pain medication, such as gabapentin or pregabalin, *sooner*, "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409. Further, prison inmates are not entitled to demand specific care. *Arnett*, 658 F.3d at 754. The Seventh Circuit has routinely rejected claims by prisoners that are "based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment." *Lockett*, 937 F.3d at 1024 (emphasis in original). Plaintiff presents no such evidence here.

Finally, to the extent that plaintiff also complains of delays in receiving a steroid injection, he does not show that Hoffman's decision to first request a consultation with the UW Health pain clinic was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Nor does plaintiff show that Hoffman had any involvement in scheduling appointments or control over the treatment decisions made by other medical providers at offsite facilities once the scheduled appointments occurred. *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) (defendants cannot be held liable under § 1983 "if the remedial step was not within their power"). Moreover, delays in receiving care for non-

urgent conditions are typical and do not suggest that plaintiff's needs were disregarded with deliberate indifference. *See Williams v. Tannan*, No. 20-cv-1659, 2022 WL 1620347, at *5 (E.D. Wis. May 23, 2022) ("Having to wait before seeing a doctor for a non-emergency situation is not deliberate indifference; it is a fact of life, inside and outside of prison."). Because no reasonable jury could conclude that Dr. Hoffman was deliberately indifferent to plaintiff's complaints of pain, he is entitled to summary judgment on plaintiff's Eighth Amendment claims against him.

### B. Claims Against HSM Huneke

Defendant Huneke argues that plaintiff cannot establish that she acted with deliberate indifference to a serious medical need either. The court agrees. As the HSM serving in an administrative or supervisory role, Huneke was not responsible for treating inmates and had no authority to prescribe medications or other treatments that could only be authorized by ACPs. (Huneke Decl. (dkt. #65) ¶¶ 8-12.) To be held liable under § 1983, a plaintiff must prove the defendant's personal participation or direct responsibility for the alleged constitutional deprivation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cnty.*, 830 F.3d 464, 469 (7th Cir. 2016)). If the defendant lacked authority to provide the care requested, she cannot be held liable for violating the plaintiff's rights. *See Miller*, 698 F.3d at 962; *Scott v. Brown*, No. 24-cv-103-jdp, 2025 WL 2322394, at *6 (W.D. Wis. Aug. 12, 2025).

Plaintiff does not dispute that he was under the care of Dr. Hoffman and other ACPs, who were responsible for his plan of care. Plaintiff presents no evidence from which a reasonable jury could conclude that defendant Huneke was personally involved in

providing medical treatment, nor that she had *any* authority over the treatment he was prescribed.  *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017); *see also Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (holding that a health services manager was not liable where she had no authority to intervene in treatment prescribed by a doctor).  Likewise, plaintiff points to no evidence showing that defendant Huneke was not entitled to defer to Dr. Hoffman's medical judgment.  *Pulera v. Sarzant*, 966 F.3d 540, 553 (7th Cir. 2020); *see also Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions given by physicians" unless "it is apparent that the physician's order will likely harm the patient.").  In addition, although defendant Huneke held an administrative and supervisory role in the HSU, plaintiff cannot hold her vicariously liable for the actions of his treatment providers or insist that she perform the jobs of others.  *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[N]o prisoner is entitled to insist that one employee do another's job").  Because no reasonable jury could find that defendant Huneke acted with deliberate indifference to plaintiff's medical needs, plaintiff does not establish an Eighth Amendment violation, and she is entitled to summary judgment on plaintiff's claim against her, as well.

### C. Claims Against Dr. LaVoie

Finally, plaintiff claims that defendant Dr. LaVoie violated his rights by taking 40 days to approve his steroid injection.  However, the undisputed record shows that LaVoie had no involvement in plaintiff's care beyond approving Dr. Hoffman's prior approval request for a pain clinic consultation the same day that it was submitted.  Thus, Dr. LaVoie reasonably asserts that he had no personal involvement in plaintiff's direct medical care

and plaintiff has established no basis for liability against him in his supervisory capacity. Plaintiff has not offered any argument in response to the defendants' motion for summary judgment on the claims against Dr. LaVoie and has apparently abandoned those claims. *See Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (recognizing that a plaintiff may abandon a claim by failing to respond to argument against it at the summary judgment stage); *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Because there is no evidence from which a reasonable jury could find a constitutional violation, Dr. LaVoie is entitled to summary judgment on the claims made against him.

## II. Qualified Immunity

Additionally, the defendants assert entitlement to qualified immunity. (Dkt. #62, at 18-21.) Qualified immunity protects government officials from liability for damages unless they violate statutory or constitutional rights that were clearly established at the time of the violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense is raised, a plaintiff bears the burden of defeating it. *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023). Plaintiff has not come forward with evidence showing that the defendants violated his constitutional rights by denying him adequate medical care with deliberate indifference. Accordingly, the court concludes that the defendants are also entitled to qualified immunity, although the outcome is the same.

ORDER

IT IS ORDERED that:

1) The motion for summary judgment filed by defendants Dr. Karl Hoffman, Roslyn Huneke, and Dr. Daniel LaVoie (dkt. #61) is GRANTED.

2) The clerk of court is directed enter judgment in favor of the defendant and to close this case.

Entered this 22nd day of January, 2026.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge